**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**1903 OBSCENE MAGAZINES, CUSTOMS SEIZURE NUMBER 88–0901–00001 and 800 Magazines, Seizure Number PX 88/56, Defendants–Appellants.**

**No. 881, Docket 89–6228.**

United States Court of Appeals,
Second Circuit.

Argued March 14, 1990.
Decided July 5, 1990.

---

Joseph M. Latona, Buffalo, N.Y. (Paul J. Cambria, Jr., and Cherie L. Peterson, Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y., of counsel), for defendants-appellants.

Martin J. Littlefield, Asst. U.S. Atty., W.D.N.Y., Buffalo, N.Y. (Dennis C. Vacco, U.S. Atty., W.D.N.Y., Buffalo, N.Y., of counsel), for plaintiff-appellee.

Before KEARSE, CARDAMONE and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal requires us to interpret the meaning of the words "from any foreign country." The question arises in a commercial setting between Trans World News of Cleveland, Ohio (Trans World) and North American News of Toronto, Canada (North American), two companies that have been doing business with each other for over 20 years. In the instant case Trans World shipped nearly 70,000 magazines to Canada. When the shipments reached the Canadian border more than 10,000 of them were rejected as sexually explicit material, offensive to Canadian standards. Upon return of the magazines to the United States, Customs officials seized 2,703 of them after determining there was probable cause to believe they were obscene under standards in the Western District of New York.

Business as usual between these two companies is plainly acknowledged to be, at least in part, a "dirty" business since the possibility that these titles would not clear customs was recognized by the open account between them. A bill is sent along by Trans World with the shipment, but if the goods do not clear customs, a credit is issued. Not only did the offensive magazines fail to clear both Canadian and United States Customs, they were later seized pursuant to the Tariff Act of 1930 § 305(a), as

amended, 19 U.S.C. § 1305(a) (1988) (Act), which prohibits the importation of obscene materials into the United States from any foreign country, and forfeiture proceedings were instituted against them by the United States government.

Trans World, the shipper, appeared and answered, challenging the seizures. It alleges that the Act has no application to this shipment because having been refused entry into Canada, it never "entered" that country. Hence, the magazines could not later be "imported" into the United States "from a foreign country." Thus, the meaning of these terms is critical to a resolution of this appeal.

## FACTS

The facts are undisputed. Three shipments of magazines were made by Trans World from Cleveland, Ohio to North American in Toronto, Canada. The first shipment consisting of 25,525 sexually explicit magazines was made on July 23, 1987. A second shipment of 26,258 of the same kind of magazines was dispatched on September 4, 1987. When Canadian Customs officers examined these two shipments they determined that a total of 5,603 magazines were offensive by Canadian standards and ordered them returned to the United States. Seven hundred of these magazines were held by Canadian Customs for more than three weeks; 1203 others were held in excess of two months. North American returned the rejected publications to the United States, addressed to Trans World, in boxes marked "American Goods Refused Being Returned" and "Refused Entry."

United States Customs officials inspected the returned goods when they arrived at the border. They determined that there was probable cause to believe that 1,903 of the magazines were obscene, and confiscated them. The United States later filed an *in rem* forfeiture complaint on October 6, 1987 alleging that the magazines were obscene. *United States v. 1903 Obscene Magazines, Customs Seizure No. 88-0901-00001*, No. 87-1304C (W.D.N.Y. Oct. 6, 1987).

A third shipment consisting of 17,584 magazines was trucked from Trans World to North American on October 1, 1987. After being in Canadian Customs' custody for almost four months, Canadian Customs refused entry to 4,634 magazines that were then returned by North American to Trans World, as consignee. Upon arrival at the United States border on January 29, 1988, United States Customs determined that there was probable cause to believe 800 of them were obscene and seized them. A forfeiture complaint against the 800 magazines was filed February 1, 1988. *United States v. 800 Magazines, Seizure No. PX 88/56*, No. 88-120C (W.D.N.Y. Feb. 1, 1988).

Trans World, the distributor of the magazines, as claimant, filed an answer in each of the two cases contesting the legality of the seizure at the United States border. It moved for summary judgment in each case asserting the magazines were not subject to seizure because they were not being "imported" into the United States "from a foreign country" within the meaning of the Act.

The cases came before Judge Curtin of the United States District Court for the Western District of New York, who denied claimant's motions for summary judgment in a June 20, 1989 opinion and order. He held that goods need not be exported from another country before they can be considered to be imported into the United States under the terms of the Act. "[B]ecause the magazines ... had crossed the United States border, they were properly seized as imports under the Act upon their return." *1903 Obscene Magazines*, 715 F.Supp. 470, 472 (W.D.N.Y.1989). Pursuant to 28 U.S.C. § 1292(b) (1988), Judge Curtin certified his interlocutory order for appeal on September 7, 1989, and on November 14, 1989 ordered the two cases consolidated. We affirm the district court's denial of appellant's motions for summary judgment.

## DISCUSSION

### A.

■ The formidable task of protecting the integrity of our national borders has

been delegated by Congress to the executive branch under a broad grant of authority. *See United States v. Ramsey,* 431 U.S. 606, 616–17, 97 S.Ct. 1972, 1978–79, 52 L.Ed.2d 617 (1977). The United States Customs Service has plenary power to safeguard the United States borders, which includes the power to inspect any person or thing that presents itself at a border seeking entrance. *See* 19 U.S.C. § 1581(a) (1988); *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) ("Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."). Customs officials are more than investigative law enforcement officers; they are also charged with protecting this Nation from harmful or illegal substances that may gain entrance. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 544, 105 S.Ct. 3304, 3312, 87 L.Ed.2d 381 (1985); *see also Alexander v. United States,* 362 F.2d 379, 382 (9th Cir.), *cert. denied,* 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966).

■ Importation of obscene materials is prohibited by 19 U.S.C. § 1305(a):

> All persons are prohibited from importing into the United States from any foreign country ... any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral.... No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles ... shall be subject to seizure and forfeiture....

Trans World does not claim that the Customs officers lacked authority to search the boxes of magazines presented at the border. Such searches are clearly permissible. Thus, a traveler seeking entrance to the United States has no Fourth Amendment right to be let alone, his luggage and personal effects may be searched without probable cause, and illegal materials that are in his possession may be seized. *See United States v. Thirty–Seven (37) Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971).

What claimant contends is that § 1305(a) does not authorize seizure of the subject magazines because the statute is narrowly drawn to authorize seizure only of "import[s] ... from any foreign country." And, to repeat its argument, because the magazines were refused entry into Canada from the United States they were not upon their return imported into the United States from a foreign country within the meaning of the Act.

### B.

■ Much of the case law interpreting the term "import" has its genesis in the Constitution's treatment of the power of taxation. Article I, § 10, cl. 2 of the Constitution provides that "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws...." The power to lay and collect import duties, of course, was conferred on Congress. U.S. Const.Art. I, § 8, cl. 1. The framers feared that international commerce would be burdened if goods were subjected to unequal taxation by the various states. Yet, the law has always been that after importation becomes complete and the goods enter the stream of goods within a state, the state has the undoubted right to tax them. *See Brown v. Maryland,* 25 U.S. (12 Wheat. 419) 266, 278–80, 6 L.Ed. 678 (1827).

As a consequence, in sorting out the right of Congress and the right of individual states to tax goods the definition of the word "import" had significance from the early days of our Republic. Chief Justice Marshall, for example, said that imports are "the articles themselves which are brought into the country." *See id.* 25 U.S. at 277. Consistently, it was later held that importation "consists in bringing an article into a country from the outside." *Cunard*

*S.S. Co. v. Mellon,* 262 U.S. 100, 122, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923). Webster's Third New International Dictionary (1981 ed.) defines import as "to bring ... into a place or country from another country." *Id.* at 1135.

It seems plain from this brief recitation that none of the sources using the word "imports" refer to their foreign origin. As the Supreme Court has observed, because most imports do originate from a foreign country courts have tended to refer to imports in that fashion, *see Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 669, 65 S.Ct. 870, 879, 89 L.Ed. 1252 (1945), with support from the dictionary—which adds to the earlier definition—"to bring from a foreign or external source." To resolve this somewhat ambiguous situation, the Supreme Court in *Hooven* held that goods that come into this country from a place without—though not of foreign origin—are imports in the constitutional sense. *See id.* at 671, 65 S.Ct. at 880.

The immunity of the goods from state taxation—the history of which has been alluded to—until the goods can fairly be said to have entered the state's stream of taxable property is an important aspect of the *Hooven* holding, *see id.* at 667–68, 65 S.Ct. at 878, because it resolves the tension between federal and state taxing power. That concept does not support appellant's proposition that the goods in question must first have entered into Canada's mass of property—rather than resting in a warehouse—in order to be subject later to United States import duties or seizure. This argument might have merit were this litigation between a state and the federal government, but this view is wholly misplaced in the present setting. Further, it has been held that goods need not have entered a foreign country's stream of commerce in order to be imported within the meaning of § 1305(a). *See United States v. Various Articles of Obscene Merchandise, Schedule No. 2098,* 536 F.Supp. 50, 52 (S.D.N.Y.1981) (video cassettes of movies purchased in the United States and mailed to Germany were imported when mailed back to the United States); *United States v. Eight Reels of Film,* 491 F.Supp. 129, 131–32 (W.D.Tex.1978) (importation occurred when films were taken out of the U.S. into Mexico in the trunk of a car, remained in the trunk and were returned to the U.S.), *aff'd mem.,* 620 F.2d 299 (5th Cir.1980).

### C.

◼ Turning to the facts in this case, the magazines were clearly exported from the United States when they were shipped from Cleveland to North American in Toronto with the intent that they remain in Canada. *See* 19 C.F.R. § 101.1(k) (1989); *Swan & Finch Co. v. United States,* 190 U.S. 143, 145, 23 S.Ct. 702, 703, 47 L.Ed. 984 (1903). After Canadian Customs rejected the shipment, the magazines were presented at the United States border for re-entry. Whether the magazines were accepted into Canada or denied entry and held by Canadian Customs is irrelevant. Regardless of their fate in Canada the objectionable publications were presented at the United States border for entry into the United States from without when they were seized.

Existing case law supports the conclusion that an importation occurred. We have previously ruled that the point of origin is immaterial to whether there was an importation within the meaning of § 1305(a). *United States v. Various Articles of Obscene Merchandise, Schedule No. 2127,* 705 F.2d 41, 42 n. 2 (2d Cir.1983) (magazines purchased in the U.S. and taken abroad were considered imported when shipped back to the U.S.). In *United States v. 10,000 Copies New York Nights,* 10 F.Supp. 726 (S.D.N.Y.1935), a case quite similar to this one, material refused entry into England was seized pursuant to § 1305(a) upon its return to the United States. *Id.* at 727. The court there stated that importation had occurred despite the fact that the goods were present in Britain only under the custody of British Customs. *Id.* at 728–29. Although the goods in *New York Nights* were "presumptively entered" into Great Britain pursuant to British law, *id.* at 727, this is a distinction that makes no difference in the result. *See Hooven,* 324 U.S. at 670, 65 S.Ct. at 879.

Moreover, construing § 1305(a) to prohibit seizure of contraband at the border when the material failed to clear customs at the country to which export was attempted would unreasonably impair United States Customs from effectively functioning as a law enforcement agency. It is absurd to suppose that the Customs officer may lawfully search and inspect materials presented at the border, but upon discovering material that appears to be contraband, must let it pass unless it was at one time introduced into the commerce of a foreign country.

Consequently, we hold that goods rejected by the Customs officials of a foreign country to which export is attempted are imported "from [that] foreign country" within the meaning of § 1305(a).

## CONCLUSION

The order of the district court denying Trans World's motions for summary judgment is accordingly affirmed.