### State of Vermont v. William C. Coburn

[683 A.2d 1343]

No. 95-537

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 12, 1996

*Lamar Enzor*, Rutland County Deputy State's Attorney, Rutland, for Plaintiff-Appellee.

*Matthew I. Levine* of *Griffin & Levine*, White River Junction, for Defendant-Appellant.

**Allen, C.J.** Defendant entered a conditional plea of nolo contendere to a charge of possessing marijuana (18 V.S.A. § 4230(a)(3) and 13 V.S.A. § 9) and appeals the Orange District Court's denial of his motion to suppress evidence. We affirm.

On August 6, 1994, defendant arrived at the John F. Kennedy International Airport in New York City on an Air Jamaica flight, direct from Jamaica, W.I. Traveling with him were two suitcases, each with an airline identification tag, and one with the name of "Bill Coburn" and a Randolph, Vermont address. A narcotics dog on the tarmac alerted United States Customs Officer Mesmore to one of defendant's suitcases as luggage was loaded on a conveyor belt leading to the terminal baggage claim area. Officer Mesmore removed that suitcase from the conveyor belt; defendant's second suitcase continued inside on the conveyor belt. Inside the terminal baggage claim area, another narcotics dog alerted Customs Officer Strasser to defendant's second suitcase as it was sitting next to the conveyor belt inside the terminal.

When all of the passengers had cleared the baggage claim area, both suitcases were delivered to Customs Inspector Irwin, who asked Air Jamaica officials to open the suitcases. Inspector Irwin noticed a strong odor of glue when one of the suitcases was opened. He removed the liner from the suitcase and discovered a number of bags, wrapped in opaque brown tape, secured to the inside perimeter of the suitcase. A small sample was taken from a bag and field tested; the test was positive for marijuana. Inspector Irwin replaced all of the items in the suitcase, including the bags of marijuana, and transferred custody of the suitcases to Customs Agent Michael. Because federal authorities were not interested in pursuing criminal charges against defendant, Agent Michael telephoned Customs Agent Lussier in Burlington. Agent Lussier was instructed to contact Vermont State Police about possible state prosecution of defendant.

Agent Michael removed the packets of marijuana from the suitcase in which they were found, placed them in a box, and sealed the box as evidence. He then emptied that suitcase and put all of the clothing and other personal items into the second suitcase. He delivered the sealed evidence box containing the marijuana to the evidence custodian for Customs at the JFK Airport. Agent Michael delivered the other suitcase containing defendant's clothing and other personal items to an Air Jamaica representative.

A person subsequently telephoned Air Jamaica on behalf of defendant requesting the suitcases. On August 9, 1994, Agent Michael personally delivered both suitcases and the sealed evidence box to Agent Lussier in Burlington.

Agent Lussier delivered custody of the three items to Vermont State Police Detective Cucinelli, who photographed the insides of both

suitcases and examined their contents. He then placed all of the bags of marijuana into the empty suitcase; defendant's clothing and other personal items remained in the other suitcase. He closed both suitcases and placed them in the evidence locker at the Williston Barracks.

Detective Cucinelli removed the suitcases on August 10, 1994, and transported them to the Vermont State Police Laboratory for fingerprinting and drug analysis. A drug analysis was performed, which was positive for the presence of marijuana. At no time was a warrant obtained for any of the searches or testing by either Customs officials or the Vermont State Police.

After the laboratory tests were completed, Detective Cucinelli made a controlled delivery to defendant, who was immediately arrested. The next day the suitcases were again delivered to the Vermont State Police Laboratory for further testing, again without a warrant.

Defendant was charged with possession of marijuana and entered his nolo plea, subject to the trial court's ruling on his motion to suppress evidence. The court denied his motion, and the present appeal followed.

## I.

Defendant concedes the legality of the canine sniff of his luggage at JFK Airport. He argues, however, that this initially lawful search of his luggage became unlawful when Customs officials, and later the Vermont State Police, opened his luggage and examined the contents without a warrant. He also argues that the initially lawful seizure of his luggage became unlawful when Customs officials and Vermont police retained his luggage for five days and when his luggage was transferred from one jurisdiction to another, all without a warrant.

■ Defendant first contends that the Customs agents should have obtained a warrant to open his luggage and examine its contents after the canine sniff indicated the presence of illegal drugs. Defendant's argument is contrary to United States Supreme Court precedent. When persons enter the United States at a border crossing, a routine search of those persons and their belongings without reasonable suspicion or probable cause and without a warrant is per se reasonable. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985); see also *United States v. Ramsey*, 431 U.S. 606, 619 (1977) (routine search at border crossing without probable cause or warrant

is reasonable). "A routine border search contemplates the search of a person's luggage and other personal effects." *United States v. Moody*, 649 F.2d 124, 127 (2d Cir. 1981). Therefore, Customs officials at JFK International Airport could lawfully open defendant's luggage and examine its contents without any suspicion and without a warrant.

Defendant also argues that the subsequent examination of his luggage and its contents by Vermont police violated the Fourth Amendment. In *Illinois v. Andreas*, 463 U.S. 765 (1983), Customs officials discovered marijuana during a legal warrantless search of a locked shipping container that arrived in Chicago on a flight from India. The Customs officials notified the Drug Enforcement Administration (DEA). DEA agents and Chicago police subsequently re-sealed the container and made a controlled delivery to the defendant. The defendant argued that the police needed a warrant to reopen the container after the controlled delivery. The *Andreas* Court concluded that "[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal." *Id.* at 771. Therefore, once Customs agents lawfully opened defendant's luggage and discovered marijuana, he lost any privacy interest in the contents of his luggage.

■ Moreover, the resealing of defendant's luggage for shipment to Vermont did not revive his privacy interest. In *Andreas*, no privacy interest arose as a result of resealing of the shipping container for controlled delivery to the defendant. According to the Court, "[t]he simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore lawfully invaded privacy rights." *Id.*

The *Andreas* Court's holding was supported by the plain-view doctrine. *Id.* The plain-view doctrine is based on the proposition that once police lawfully observe an object firsthand, the owner's privacy interest in that object is lost. *Id.*; *see also Horton v. California*, 496 U.S. 128, 136 (1990) (restating plain-view doctrine).

> [O]nce a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost. Consequently, the subsequent reopening of the container is not a "search" within the intendment of the Fourth Amendment.

*Andreas*, 463 U.S. at 771-72. Moreover, where law enforcement officers are cooperating in an investigation, as was the case here from the time that Customs officials decided not to prosecute and contacted the Vermont State Police, the knowledge of one is presumed to be shared by all. *Id.* at 771 n.5.

█ The fact that defendant's luggage was transferred by Customs officials to the Vermont State Police and that it was shipped from New York to Vermont does not change the result. In *People v. Adler*, 409 N.E.2d 888 (N.Y. 1980), a package declared to contain a vase was x-rayed by a suspicious airline employee and found to contain a large quantity of pills. The airline employee contacted the DEA, and a DEA agent took custody of the package. A laboratory analysis of the pills revealed them to be amphetamines and barbiturates. The DEA agent marked his initials on the inside of the box, repackaged the contents, and returned the box to the airline for shipment to New York. The DEA agent also contacted New York police, who intercepted the package upon arrival. The New York police opened the package, verified that the pills were amphetamines and barbiturates, verified the presence of the DEA agent's markings, and resealed the package. The package was later claimed by the defendant, who was arrested when she took control of the package. The defendant argued that the New York police violated the Fourth Amendment by searching the package without a warrant. The court held that "when the New York police searched the package, there was no independent intrusion requiring a warrant, but simply a continuation of the valid search and seizure effected in Los Angeles." *Id.* at 892. Because the conduct of Vermont police is a continuation of the legal conduct of Customs officials, and there has been no break in the chain of custody, their conduct is not a second search under the Fourth Amendment. See *Andreas*, 463 U.S. at 772-73 (absent likelihood contents of container have changed, no legitimate expectation of privacy remains in container previously opened under lawful authority); accord *United States v. DeBerry*, 487 F.2d 448, 451 (2d Cir. 1973); *McConnell v. State*, 595 P.2d 147, 152-55 (Alaska 1979).*

Similarly, the transfer of defendant's luggage from federal jurisdiction to state jurisdiction for purposes of a state prosecution does

---

*Defendant cites *United States v. Crochetiere*, No. 88-74-01 (D. Vt. March 9, 1989), as support for his argument that Vermont police exceeded the scope of the initial Customs search. *Crochetiere* is distinguishable because it involved a private search followed by a subsequent warrantless government search that exceeded the scope of the private search.

not violate the Fourth Amendment. "So long as the evidence seized in a permissible, routine customs border inspection meets federal standards for such searches . . . it is no violation of the defendant's [federal] constitutional rights if the evidence is later used in a state prosecution." *State v. Dreibelbis*, 147 Vt. 98, 100, 511 A.2d 307, 308 (1986).

Defendant argues that his Fourth Amendment rights were violated because Customs officials retained his suitcases and their contents for three days before forwarding them to Vermont and because the Vermont State Police retained them for an additional two days. Defendant relies on *United States v. Place*, 462 U.S. 696 (1983), as support for his argument. *Place*, however, is distinguishable. In *Place*, the defendant's luggage was seized by Customs officials at LaGuardia Airport after he acted suspiciously upon questioning. After first moving the defendant's luggage to JFK Airport, government agents retained the luggage for ninety minutes to await the arrival of a narcotics dog. Applying principles from *Terry v. Ohio*, 392 U.S. 1 (1967), the United States Supreme Court held that government agents could briefly detain the defendant's luggage based on reasonable suspicion. *Place*, 462 U.S. at 706. Nevertheless, the Court held that the defendant's Fourth Amendment rights were violated because the ninety-minute delay was longer than reasonably necessary to confirm or dispel the initial suspicion. *Id.* at 709-10. Thus, at issue in *Place* was the length of seizure *before* the canine sniff test was performed. Here, defendant argues that his luggage was detained for an unreasonable period of time after the lawful discovery of contraband by Customs agents. *Place* is therefore inapposite.

As contraband, an instrumentality of a crime, and evidence of a crime, defendant's luggage and its contents could be seized and held by Customs officials or the Vermont State Police pending prosecution. See *Warden v. Hayden*, 387 U.S. 294, 306-07 (1967). Defendant has failed to articulate how the retention of his luggage for five days for further investigation, to transfer it from New York to Vermont and to arrange a controlled delivery in Vermont, violated the Fourth Amendment.

## II.

Defendant also appeals the court's denial of his motion for suppression under Chapter I, Article 11 of the Vermont Constitution, arguing that even if no violations of the Fourth Amendment exist, the conduct

of the Customs officials had to pass muster under the Vermont Constitution as well. The trial court rejected defendant's state constitutional claim on grounds that the Supremacy Clause and the express delegation of powers to the Congress in the United States Constitution bars reconsideration of the lawfulness of the Customs officials' conduct by Vermont courts under the Vermont Constitution.

We defer to federal law where the federal interest in the conduct at issue outweighs Vermont's interest. See *State v. St. Francis*, 151 Vt. 384, 391, 563 A.2d 249, 253 (1989). With respect to safeguarding the United States border or its functional equivalent, *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973), the federal interest is preeminent. Control of commerce with foreign nations is an exclusively federal function under the United States Constitution, U.S. Const. art. I, § 8, cl. 3, and "[t]he authority of the United States to search the baggage of arriving international travelers is based on its inherent sovereign authority to protect its territorial integrity." *Torres v. Puerto Rico*, 442 U.S. 465, 472-73 (1979); see also *United States v. 1903 Obscene Magazines*, 907 F.2d 1338, 1341 (2d Cir. 1990) ("The United States Customs Service has plenary power to safeguard the United States borders, which includes the power to inspect any person or thing that presents itself at a border seeking entrance.").

We therefore hold that the Vermont Constitution does not apply to the conduct of federal government officials acting under the exclusive federal authority to safeguard the borders of the United States. We are not alone in holding that the state constitution does not apply to federal border searches. See, e.g., *People v. Mitchell*, 79 Cal. Rptr. 764, 767 (Ct. App. 1969) ("A border search by a United States Customs Officer is lawful; does not depend upon probable cause; and is not governed by state laws."); *Morales v. State*, 407 So. 2d 321, 329 (Fla. Dist. Ct. App. 1981) (evidence seized by Customs officers pursuant to reasonable border search is clearly admissible in either federal or state courts); *State v. Allard*, 313 A.2d 439, 451 (Me. 1973) (no state constitutional violation where Customs officer turned over evidence to state police); *State v. Bradley*, 719 P.2d 546, 549 (Wash. 1986) ("Neither state law nor the state constitution can control federal officers' conduct.").

Because the Vermont Constitution does not apply to the otherwise lawful conduct of Customs officials, our scrutiny under Chapter I, Article 11 of the Vermont Constitution is limited to the conduct of the Vermont State Police. Defendant correctly argues that standing to

challenge searches is broader under the Vermont Constitution than under the United States Constitution. See *State v. Wood*, 148 Vt. 479, 489, 536 A.2d 902, 908 (1987) (standing to challenge police conduct under Vermont Constitution exists if defendant has possessory, proprietary, or participatory interest in items seized or area searched). Although defendant has standing to challenge the conduct of the Vermont police, he fails to articulate how his already vitiated possessory interest in his luggage was revived upon transfer from Customs to the Vermont police. Moreover, because the conduct of the Vermont police is lawful under the Fourth Amendment, using a plain-view rationale, it is similarly lawful under the Vermont Constitution using the same rationale. See *State v. Badger*, 141 Vt. 430, 454, 450 A.2d 336, 350 (1982) (police lawfully seized defendant's blood-stained shoes as incriminating evidence because defendant openly displayed them to public). Finally, the retention of defendant's luggage and contents for two days does not violate the Vermont Constitution. Although defendant retained a possessory interest in his suitcases and personal effects, Vermont police could lawfully seize and retain them as evidence to be used in prosecuting defendant.

*Affirmed.*