2014 VT 8

# State of Vermont v. Dorren A. Rennis

[90 A.3d 906]

No. 12-481

Present: **Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Crawford, Supr. J., Specially Assigned**

Opinion Filed January 17, 2014

*William H. Sorrell,* Attorney General, and *David Tartter,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates,* Barre, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant appeals the decision of the superior court, which held that evidence seized by federal border patrol agents in compliance with the Federal Constitution and federal border patrol policies may not be suppressed based on an alleged violation of Article 11 of the Vermont Constitution when offered by the State in a state prosecution. We affirm.

¶ 2. The facts of this case are not in dispute. The U.S. Border Patrol maintains a checkpoint in Hartford, Vermont, south of the intersection of highways I-91 and I-89 and approximately ninety-seven miles south of the Canadian border. The purpose of the checkpoint, as stated by the trial court, is "to locate and apprehend individuals and/or contraband that have entered the country illegally." When operational, the checkpoint consists of a "primary inspection," through which all vehicles on I-91 South must pass and occupants must answer questions about their citizenship, and a secondary inspection site in an adjoining rest area, to which vehicles may be diverted for a longer inspection based on what occurred during the primary inspection.

¶ 3. Defendant, travelling south on I-91, was stopped at the primary inspection site. The Border Patrol agent on duty asked him about his citizenship, and defendant responded that he was a U.S. citizen. On hearing defendant's accent, the agent asked

defendant where he was born, and defendant said he was born in Jamaica. The agent again asked defendant about his citizenship, and defendant said he was a citizen of Jamaica, but a legal permanent resident of the United States. Defendant did not have his immigration papers with him, which is a misdemeanor under federal law. 8 U.S.C. § 1304(e). The agent also thought he smelled burnt marijuana in the vehicle and asked defendant if he had been smoking marijuana or if there was any marijuana in the car. Defendant said no. Based on this interaction, the agent asked defendant to pull his car onto the ramp of the rest area leading to the secondary inspection site.

¶ 4. On the ramp leading to the rest area, another agent with a trained drug-detection dog ran the dog around the car, and the dog did not alert. Defendant got out of his car. The dog entered the car and began to bark. This conduct was apparently contrary to its trained drug-alert response, which was to sit down. During the dog sniff, defendant admitted to the dog handler that he had smoked marijuana in the car.

¶ 5. Defendant was told to drive further into the rest area, to the secondary inspection point. The original agent then asked defendant if he could search the car, and defendant agreed. The agent opened the trunk and found a backpack. The agent asked defendant what was in it, and defendant said he did not know. The agent asked him to open the backpack and defendant complied. Inside the backpack were two freezer bags with a green leafy substance. The dog was brought back to the trunk, and this time the dog alerted. When asked what was in the bags, defendant said "marijuana." The agents seized two pounds of marijuana and contacted federal Immigration and Customs Enforcement (ICE). When ICE declined to prosecute, the federal agents sent the drugs to the State, which initiated this case.

¶ 6. Defendant moved to suppress the drugs alleging violations of both the Fourth Amendment of the U.S. Constitution and Chapter I, Article 11 of the Vermont Constitution. The trial court denied the motion. On appeal, defendant concedes the legality of the search under the Fourth Amendment but challenges admissibility of the evidence under Article 11. Defendant entered a conditional plea of guilty to possession of marijuana in violation of 18 V.S.A. § 4230(a)(3), pending the appeal of this sole issue.

¶ 7. Motions to suppress commonly present mixed questions of law and fact. See, e.g., *State v. Bauder*, 2007 VT 16, ¶ 9, 181 Vt.

392, 924 A.2d 38. In this case, however, the parties do not dispute the trial court's findings of fact, and we are left with only a question of law. We review questions of law de novo. *Id.*

¶ 8. We find this case to be squarely controlled by our precedent in *State v. Coburn*, 165 Vt. 318, 683 A.2d 1343 (1996). In that case, the defendant's suitcases were seized by customs agents when drug-sniffing dogs alerted to them at a New York City airport after defendant arrived on a direct flight from Jamaica. The federal agents searched the bags and found marijuana. One of the bags had a Vermont address tag and, after someone called to request the bags, they were transferred to federal agents in Burlington. The federal authorities declined to prosecute and delivered the suitcases, with the drugs, to the Vermont State Police. The Vermont State Police opened the suitcases, photographed the contents and tested the marijuana. Approximately five days after the suitcases arrived in the United States, the Vermont State Police made a controlled delivery to the defendant and arrested him immediately. The defendant challenged the legality of the warrantless federal and state searches of his suitcases on both Fourth Amendment and Article 11 grounds. *Id.* at 322-24, 683 A.2d at 1345-47.

¶ 9. ■ The key holding of *Coburn* is that "the Vermont Constitution does not apply to the conduct of federal government officials acting under the exclusive federal authority to safeguard the borders of the United States." *Id.* at 325, 683 A.2d at 1347. We reached that conclusion by noting that "[w]e defer to federal law where the federal interest in the conduct at issue outweighs Vermont's interest," *id.* (citing *State v. St. Francis*, 151 Vt. 384, 391, 563 A.2d 249, 253 (1989)), and that the federal interest in "safeguarding the United States border or its functional equivalent . . . is preeminent." *Id.* (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973)).

¶ 10. ■ We add to *Coburn*'s holding now only to note that the "functional equivalent" of the U.S. border generally includes immigration checkpoints, such as those within the parameters listed in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976):

> The Border Patrol believes that to assure effectiveness, a checkpoint must be (i) distant enough from the border to avoid interference with traffic in populated areas near the border, (ii) close to the confluence of two or more

significant roads leading away from the border, (iii) situated in terrain that restricts vehicle passage around the checkpoint, (iv) on a stretch of highway compatible with safe operation, and (v) beyond the 25-mile zone in which "border passes" are valid.

*Id.* at 553 (citation omitted). Federal courts have theoretically validated such checkpoints up to one hundred air miles from the physical border of the United States. See *Almeida-Sanchez*, 413 U.S. at 268, 272-73 (citing hundred-mile limit of 8 C.F.R. § 287.1 and stating in dicta that "searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches"); *United States v. Gabriel*, 405 F. Supp. 2d 50, 57 & n.10 (D. Me. 2005) (citing hundred-mile limit of 8 C.F.R. § 287.1(a)(2) while upholding constitutionality of temporary checkpoint seventy miles from Canadian border). Since the constitutionality of the Hartford checkpoint under the Fourth Amendment is not before us, we assume without deciding that the Hartford checkpoint meets these criteria for the "functional equivalent" of the U.S. border. Thus, the federal interest in the conduct of its officers at the Hartford checkpoint outweighs Vermont's interest, as described in *Coburn*, 165 Vt. at 325, 683 A.2d at 1347.

¶ 11. ■ Defendant's Article 11 challenge thus applies only to the state actors in this case. See *State v. Dreibelbis*, 147 Vt. 98, 100, 511 A.2d 307, 307 (1986) (stating that so long as evidence seized by federal customs officials during routine customs inspection meets federal standards for such searches, that evidence is admissible in state prosecution). Defendant nonetheless seems to challenge the actions of the federal officers at the checkpoint, which he has conceded were lawful under the Fourth Amendment.

¶ 12. Defendant's only argument as to *Coburn* states: "*Coburn* only holds that the Vermont Constitution does not apply to federal government officials, and that conduct of the Vermont police was lawful under the Fourth Amendment . . . and was similarly lawful under the Vermont Constitution. *Coburn* only addresses the issue of the lawfulness of police conduct." We fail to see the distinction.

¶ 13. Although the record regarding the chain of custody is less complete here than in *Coburn*, defendant does not allege that the Vermont State Police did anything other than receive the evidence uncovered in the federal search, including the drugs, from the

federal agents and proceed to use the evidence in this state prosecution. This is the same sequence of events as in *Coburn*. Like the defendant in *Coburn*, defendant here "fails to articulate how his already vitiated possessory interest . . . was revived upon transfer from [federal agents] to the Vermont police." *Coburn*, 165 Vt. at 326, 683 A.2d at 1347.

¶ 14. Disregarding our precedent in this manner, defendant urges us instead to adopt the rationale of a New Mexico Supreme Court case, *State v. Cardenas-Alvarez*, 2001-NMSC-017, 25 P.3d 225. In that case, our colleagues in New Mexico decided that, when proffered in a state prosecution, evidence seized lawfully by federal officers under the Fourth Amendment but in a manner that would be unlawful under that state's constitution must be suppressed. *Id.* ¶¶ 18-19 ("Although we do not claim the authority to constrain the activities of federal agents, we do possess the authority — and indeed the duty — to insulate our courts from evidence seized in contravention of our state's constitution.") *Id.* ¶ 19.

¶ 15. ■ Again, our reasoning in *Coburn* precludes this argument. Where we have determined that Article 11 does not apply, it also does not provide the remedy of the exclusionary rule. In other words, where federal interests outweigh Vermont's interests, we will neither attempt to deter federal officials from their duties nor reverse our determination that, "where law enforcement officers are cooperating in an investigation, as was the case here from the time that [federal] officials decided not to prosecute and contacted the Vermont State Police, the knowledge of one is presumed to be shared by all." *Coburn*, 165 Vt. at 323, 683 A.2d at 1345. Defendant's motion to suppress was therefore properly denied.

¶ 16. ■ In reaching our conclusion, we stress that we have not reached the question of whether, if the roadblock had been established by state officers, or if state officers had used the dog or searched the backpack, the search would have complied with Article 11. We hold only that this border search by federal officers, conducted in compliance with the Fourth Amendment as acknowledged by defendant, cannot be challenged under Article 11.

*Affirmed.*