**12-3908-cr**
*United States v. Vasquez Macias*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————

August Term, 2013

(Argued: November 14, 2013     Decided: January 14, 2014)

Docket No. 12-3908-cr

————

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

WALTER YOVANY VASQUEZ MACIAS,

*Defendant-Appellant.*

————

Before:

POOLER, RAGGI, AND WESLEY, *Circuit Judges.*

————

Defendant Walter Yovany Vasquez Macias appeals from a judgment of the
United States District Court for the Western District of New York (Richard
Arcara, *Judge*), in which he was convicted after a jury trial of being "found in" the

United States as a previously-deported alien, in violation of 8 U.S.C. § 1326(a) and (b)(2).  When encountered by authorities, Vasquez had left the United States and sought lawful entry into Canada, was detained, and then returned to the United States in custody.  We reverse; Vasquez was not "found in" the United States when he was here voluntarily.

REVERSED.

Judge Raggi concurs in a separate opinion.

———————

JAYME L. FELDMAN (Tracey Hayes, *on the brief*), Federal Public Defender's Office, Western District of New York, Buffalo, NY, *for Defendant-Appellant Walter Yovany Vasquez Macias*.

STEPHAN J. BACZYNSKI, Assistant United States Attorney, (Monica Richards, Assistant United States Attorney, *on the brief*), for William J. Hochul, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee United States of America*.

———————

WESLEY, *Circuit Judge*:

Walter Yovany Vasquez Macias ("Vasquez") is a citizen of Honduras with a checkered immigration history in the United States.  He was detained in California in 1990, left voluntarily, illegally reentered the country, and then sold drugs to at least two undercover officers in the late 1990s (leading to one criminal conviction and deportation in 2000).  Vasquez again returned to the United States

without authorization in approximately 2001;[1] he claims that he subsequently

went straight and entered the antique business.

For reasons not known to us, Vasquez decided to abandon the antique

market and leave the United States. With a friend, he traveled from Texas to

Niagara Falls, where they walked across the Rainbow Bridge to Canada. Canada

Border Services Agency ("CBSA") officers first saw Vasquez on the Canadian

side of the bridge as he walked in the car lanes towards Canada; they brought

him to their facility for inspection. Vasquez lacked a passport or visa to enter

Canada and his explanations about the reasons for his travel were not plausible.

A CBSA agent testified that he "refuse[d] [Vasquez's] entry" to Canada. The

CBSA supplied Vasquez with an "Allowed to Leave" document, customarily

created whenever someone from the United States attempts to enter Canada and

is refused entry. Notwithstanding Canada's "allowing" Vasquez's departure,

CBSA agents forcibly returned Vasquez to the United States in handcuffs.

CBSA agents handed Vasquez over to U.S. Customs and Border Protection

("CBP") officials, who conducted an immigration investigation and records

---

[1] Although his 2001 unlawful reentry may have constituted a separate violation of 8 U.S.C. § 1326, it is not at issue in this case (and the statute of limitations on such a violation would already have expired).

check.  The CBP records check revealed that Vasquez was a Honduran citizen who had been asked to leave in 1990 and been deported in 2000 for his felony drug conviction.  Vasquez was indicted for being "voluntarily present and found in the United States."[2]  Having been in the United States illegally for approximately ten years, he was convicted based on his failed attempt to begin anew in Canada.  After trial, Vasquez renewed, albeit untimely, an earlier motion for a judgment of acquittal, arguing that he was not in the United States when he was found.

## Discussion

The parties agree as to the facts of the case and as to most of the applicable law, but leave it to this Court to determine the meaning of "found in" and whether Vasquez was continuously "in the United States" within the meaning of

---

[2] This language from his indictment does not precisely mirror the statutory requirements of 8 U.S.C. § 1326; however, we presume that he was convicted of the crime alleged in the indictment, and the Government does not allege otherwise.  If it did, then we would be forced to determine whether his conviction constituted a prejudicial variance from the terms of his indictment.

4

8 U.S.C. § 1326.[3]  Because Vasquez was not in the United States when he was "found" and, when "found in" the United States, was here involuntarily, Vasquez's conviction was plainly erroneous and it would constitute manifest injustice to allow it to stand.

## I

The Government proposed that the term "found in[] the United States" is synonymous with "present in the United States."  We have previously rejected this interpretation.  "The offense of being 'found in' the United States . . . depends not only on the conduct of the alien but also on acts and knowledge of the federal authorities."  *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995).  "The commission of the offense is not complete . . . 'until the authorities both discover the illegal alien in the United States, and know, or with the exercise of diligence

---

[3] This section indicates, in relevant part, that:

> [A]ny alien who . . . has been . . . deported, or removed . . . and thereafter . . . enters, attempts to enter, or is at any time found in, the United States, unless . . . the Attorney General has expressly consented to such alien's reapplying for admission; or . . . such alien . . . establish[es] that he was not required to obtain such advance consent . . . shall be fined under Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).  Vasquez does not contend that he had the authority to enter or that his reentry did not require advance authorization.

5

typical of law enforcement could have discovered, the illegality of his presence.'"

*United States v. Acevedo*, 229 F.3d 350, 355 (2d Cir. 2000) (alterations omitted) (quoting *Rivera-Ventura*, 72 F.3d at 282); *see also United States v. Williams*, 733 F.3d 448, 455 (2d Cir. 2013).

## II

The parties also disagree as to when Vasquez was "found in" the United States. The Government contends that, notwithstanding his physical presence north of the Canada / U.S. border, Vasquez never left the United States.[4] Vasquez argues that the first time that he was both "found" and "in[] the United States" was upon his forcible return to the custody of U.S. CBP agents. Because Vasquez was not in the United States while he was on Canadian soil seeking admission into Canada, he was not "found in" the United States until the CBSA brought him across the border in restraints and the U.S. CBP "discovered" him.

Prior to this "discovery," Vasquez physically crossed the border from the United States into Canada; at that point, he had neither a legal nor a physical

---

[4] Of course, this would mean that Vasquez was "found" by Canadian border officials in the United States. That seems a bit curious, but neither party has advanced the argument that being "found" by agents of a foreign government is not sufficient to trigger liability under the statute, and we therefore assume for the purposes of this case that the CBSA agents were capable of "finding" Vasquez.

6

presence in the United States. If found at this point, Vasquez was not "in[] the United States" pursuant to the requirements of 8 U.S.C. § 1326. Nevertheless, under similar circumstances the Ninth Circuit has twice held that the aliens were "found in" the United States pursuant to a theory that employed a legal fiction of their continuous presence in the United States after having crossed into Canadian territory. *See United States v. Gonzalez-Diaz*, 630 F.3d 1239, 1243-44 (9th Cir. 2011); *United States v. Ambriz-Ambriz*, 586 F.3d 719, 723-24 (9th Cir. 2009).[5] The Ninth Circuit lays out two rationales for its view; neither is persuasive.

First, the Ninth Circuit noted that Ambriz "was never legally in Canada, and thus, . . . was not entering the United States from a foreign country." 586 F.3d at 723; *see also Gonzalez-Diaz*, 630 F.3d at 1244. Two assumptions underlie this analysis: first, for purposes of the statute, physical presence is not synonymous with legal presence; second, Ambriz and Gonzalez-Diaz must have

---

[5] Ambriz and Gonzalez-Diaz, appellants in the Ninth Circuit cases, also returned to the United States after seeking admission to Canada. By seeking refugee status, Gonzalez-Diaz actually secured an overnight stay 55 miles into Canada before being returned to the United States in custody. *Gonzalez-Diaz*, 630 F.3d at 1241. As in this case, in *Gonzalez-Diaz* "the indictment charged Gonzalez-Diaz only . . . with being *found in* the United States." *Id.* at 1242 (emphasis retained). Nevertheless, the Ninth Circuit held that he had not left the United States for the purposes of 8 U.S.C. § 1326. *Id.* at 1244.

been legally either in Canada or in the United States.  We disagree with the second proposition and therefore do not reach the first.

Aliens attempting to enter the United States, stopped in analogous circumstances, are not legally in the United States.  *See, e.g., United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000); *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287-88 (11th Cir. 1991).  However, nothing cited in these cases, *Ambriz-Ambriz, Gonzalez-Diaz,* or the parties' briefs suggests that these aliens, turned away at a United States port of entry, were considered to be present in their countries of origin (while physically in a U.S. airport, border crossing, or port).

Indeed, the Supreme Court has recognized that a person, denied entry into the United States, might also not be present in any other country.  *See, e.g., Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 209, 216 (1953).  In *Mezei*, the Government detained and refused entry, for security reasons, to a once-resident alien returning from a trip to Hungary.  *Id.* at 207-08.  Every country consulted (France, through which he traveled *en route* to the United States; the United Kingdom; Hungary; and "about a dozen Latin American countries") refused to take him.  *Id.* at 209.  "His presence on Ellis Island did not count as

8

entry into the United States," *Zavydas v. Davis*, 533 U.S. 678, 693 (2001); however, neither was he in France, Hungary, or elsewhere.[6]

The possibility that Vasquez was outside the United States once he exited our borders finds mixed support in his treatment by customs officials at the border. A U.S. CBP official testified that Vasquez was treated, at least in some respects, as though he had never left the United States, but a CBSA agent testified that Vasquez made it far enough that he could not have turned around and returned to the U.S. side of the Rainbow Bridge. Vasquez was transported, in custody, under a status known as "immigration examination." On his return, United States officials did not permit Vasquez to leave; they took his fingerprints and ran them through national databases, questioned him in secondary inspection, forced him to fill out customs paperwork, and ultimately arrested him.

---

[6] Two recent examples of a similar phenomenon include suspected traitor Edward Snowden, who had his passport rescinded as he fled the United States for Russia and was stranded in the "transit zone" of Sheremetyevo International Airport, "which is technically considered outside Russian territory," Lukas I. Alpert, *Four Days In, Fugitive's Airport Stay Falls Short of Many Terminal Cases*, WALL. ST. J., June 27, 2013, at A6; and Mehran Karimi Nasseri, who inspired the Steven Spielberg movie *The Terminal*. *See* Ethan Gilsdorf, *Behind 'The Terminal,' A True Story*, CHRISTIAN SCI. MONITOR, June 21, 2004, at 11.

Insofar as Vasquez's treatment mirrored U.S. CBP's customary treatment of immigrants seeking to enter through ports of entry, this would be insufficient to support Vasquez's conviction for entering the United States, based on the doctrine of "official restraint." *See, e.g., United States v. Zavala-Mendez*, 411 F.3d 1116, 1119-20 (9th Cir. 2005); *Angeles-Mascote*, 206 F.3d at 531. The official restraint doctrine requires "both physical presence in the country as well as freedom from official restraint" before an "attempted entry" becomes an "actual entry." *Angeles-Mascote*, 206 F.3d at 531 (internal quotation marks omitted). The same principles apply to being "found in" the United States; if an alien's presence here (after she has left the country) is so attenuated that she has not yet "entered," then it is insufficient to support "found in" liability.[7]

The criminal liability of previously-deported, undocumented aliens who are denied admission into Canada is a new question for this Court, but we have examined the treatment of goods that were taken into Canada and did not clear

---

[7] The Ninth Circuit has held that "the official restraint doctrine 'pertains to an individual entering the United States *from a foreign country*, and thus is inapplicable'" in cases like this one. *Gonzalez-Diaz*, 630 F.3d at 1243 (emphasis added) (quoting *Ambriz-Ambriz*, 586 F.3d at 723). Neither *Gonzalez-Diaz* nor *Ambriz-Ambriz* explains why the logic of the official restraint doctrine, which distinguishes between physical and legal presence, should not apply unless an alien is entering *from another country*. *Id.*; *Ambriz-Ambriz*, 586 F.3d at 723-24.

customs. *See United States v. 1903 Obscene Magazines*, 907 F.2d 1338, 1340 (2d Cir. 1990). In *Obscene Magazines*, we held that "goods rejected by the Customs officials of a foreign country to which export is attempted are imported from that foreign country . . . ." *Id.* at 1343 (internal quotation marks and alteration omitted). "Whether the magazines were accepted into Canada or denied entry and held by Canadian Customs is irrelevant. Regardless of their fate in Canada the objectionable publications were presented at the United States border for entry into the United States from without when they were seized." *Id.* at 1342. The obscene magazines were entering the United States, regardless of whether or not they were in Canada.[8] We see no reason not to extend this reasoning to aliens' reentry into the United States.

### III

The Ninth Circuit also justified its *Ambriz-Ambriz* decision because it believed that the "found in" prong was the only way that Ambriz could be prosecuted. 586 F.3d at 723 & n.3. This assumes both that Ambriz (or Vasquez)

---

[8] At least one other circuit has held (albeit in an unpublished opinion) that U.S. citizens' reentry into the United States after a failed attempt to take an excursion into Canada constituted a separate entry into the United States. *United States v. Snyder*, No. 01-2382, 2002 WL 417278, at *1 (8th Cir. 2002).

11

could not be prosecuted for attempting to enter the United States and that the conclusion that no statute prohibits their conduct is an "untenable result." *Id.* at 723 n.3. We do not share our sister circuit's concern. While we recognize that criminal behavior should be punished, we are also mindful of the "cautionary example," *State v. Eaton*, 168 Wash. 2d 476, 483 n.4 (2010), of the infamous case of *Rex v. Larsonneur*, 24 Cr. App. R. 74, [1933] 24 A.C. 74 (Eng.).[9] Moreover, Congress has not outlawed all travel between sovereign nations, and not every unlawful stay in the United States – even by a previously-deported alien – can or should result in a criminal conviction. *Cf. United States v. Thomas*, 492 F. Supp. 2d 405, 412 (S.D.N.Y. 2007).

The law does not bend to meet the facts of each case. Although Vasquez undeniably broke the laws of the United States at some point after his 2000 deportation, he is not guilty of the crime of which he was convicted. We are not too troubled by this seeming oddity. Even though we reverse his criminal

---

[9] Criminal law scholars remember that in *Larsonneur*, a French woman lawfully in the United Kingdom was instructed to leave the country by March 22, 1933; she dutifully traveled to the Irish Free State (then a distinct entity). 24 Cr. App. R. at 76. Not only did the Irish Free State deny her admission, but "the defendant was forcibly brought back to the United Kingdom by police and then convicted of being in the U.K. illegally." Ian P. Farrell and Justin F. Marceu, *Taking Voluntariness Seriously*, 54 B.C. L. REV. 1545, 1589 (2013).

conviction, Vasquez will (again) be subject to deportation.[10] Moreover, it seems equally anomalous to punish Vasquez for being "found in" the United States when he was only "found" based on his attempt to stop living in the United States unlawfully. This would create a disincentive for undocumented, previously-deported aliens to do the one thing that Congress would most like them to do – leave. *Cf. Thomas*, 492 F. Supp. 2d at 409.

As referenced above, upon returning to the United States, Vasquez was more analogous to previously-deported aliens who seek to enter the United States at a port of entry. Like them, Vasquez was processed by U.S. CBP agents. And like the agents in *Angeles-Mascote*, the U.S. CBP agents here ran Vasquez's information through immigration databases and examined his prior immigration history. 206 F.3d at 530. Vasquez's indictment charged him only with being "found in" the United States, rather than also including the attempted entry prong of 8 U.S.C. § 1326.[11]

---

[10] While a skeptical observer might ask what good deporting Vasquez will do, as he has returned without authorization at least once already, we note that in this case Vasquez's genuine attempt to leave might hint at his disinclination to return.

[11] In *Angeles-Mascote*, the indictment charged that Angeles-Mascote "knowingly[] and unlawfully entered and was found in the United States." 206 F.3d at 530-31. Had the Government also indicted Vasquez for entering or attempting to enter the United States, we may have been faced with determining which prong of 8 U.S.C. § 1326, if any, applied to Vasquez's conduct.

13

Two primary but immaterial differences separate Vasquez from cases like

*Angeles-Mascote*.  First, unlike Angeles-Mascote, Vasquez was entering the United

States after having been denied entry into another country, rather than after

having been legally present in another country.  Because nothing in 8 U.S.C.

§ 1326 requires entry into the United States *following legal presence in another*

*country*, this distinction should not matter.  *Cf. Obscene Magazines*, 907 F.2d at

1343.  Second, unlike Angeles-Mascote, Vasquez did not wish to be inside the

United States.  Indeed, despite the indictment's (unnecessary) charge that

Vasquez "was voluntarily present" in the United States, the only expression of

Vasquez's will was his strong desire to get *out* of the country.[12]  This does not

make Vasquez *more* susceptible to prosecution under 8 U.S.C. § 1326 than if he

intended to enter the United States.

Vasquez and Angeles-Mascote were both not "in the United States" when

they were found; like Angeles-Mascote, Vasquez is therefore entitled to judgment

as a matter of law.  It was plain error for Vasquez to be convicted of

---

[12] We note that Vasquez physically left the United States and was returned in handcuffs without manifesting a desire to stay – yet the Government charged him for his "voluntary" presence.  If we felt it necessary to reach the specific *mens rea* requirement of 8 U.S.C. § 1326(a), we would likely agree with Judge Raggi's well-reasoned concurrence.

being "found in" the United States, and allowing his conviction to stand would constitute manifest injustice.

**Conclusion**

Although he had indisputably been present in the United States illegally for nearly a decade, Vasquez was not "found" while he was in this country. When he was found – admittedly not long after his departure from the United States – Vasquez had neither a physical nor a legal presence in this country. When he had been"found" and was "in[] the United States," Vasquez had been returned involuntarily with neither a desire to enter, nor a will to be present in, the United States. As a result, Vasquez was not "found in[] the United States" within the meaning of 8 U.S.C. § 1326.

For the foregoing reasons, the judgment of conviction entered in the district court is **REVERSED** and the case is **REMANDED** with instructions to enter a judgment of acquittal.

15

REENA RAGGI, *Circuit Judge, concurring in the judgment*:

The court today reverses defendant Vasquez's conviction for being "found in" the United States after deportation without the permission of the Attorney General in violation of 8 U.S.C. § 1326. I join in that judgment, but write separately because I reach that conclusion somewhat differently from my colleagues in the majority. Specifically, I construe § 1326 to require proof of a defendant's general intent to be in the United States. In the case of a defendant charged with being "found in" the United States illegally, that means proof either that a defendant was voluntarily in the United States when authorities found him physically present in this country, or that his presence in the United States at the time he was so found was a result of his last voluntary return to the United States. Neither circumstance is present here. When Vasquez was "found in" the United States by federal border authorities, he was not here voluntarily; rather, he was forcibly brought here by Canadian officials. It was this compelled return to the United States—not any earlier return preceding Vasquez's departure for Canada—that caused Vasquez to be "found" in this country. In these circumstances, I agree that the judgment of conviction must be reversed.

1

There is no need for me to repeat facts detailed by the majority. I note simply that Vasquez submits that, as a matter of law, he cannot stand convicted of having been "found in" the United States after a prior deportation because (1) United States authorities only found him in this country when he was involuntarily returned—in handcuffs—by Canadian officials who had just denied him legal entry into their country, and (2) to the extent he had voluntarily returned to the United States after deportation some years before crossing into Canada, he was never found in this country by United States officials during that time.

Neither at trial nor on appeal has the government disputed that a defendant's presence in the United States must be voluntary to support a § 1326 conviction. Indeed, the indictment so charges, and the jury was so instructed in this case. Rather, the government maintains that Vasquez's presence in the United States cannot be divorced into two parts, one before his unsuccessful entry into Canada, when he was voluntarily in this country but not yet "found" by United States officials, and the other after Canadian authorities returned him to this country in restraints, at which time he was "found" here by federal authorities. The government submits that defendant's § 1326 crime is properly

viewed as continuing, so that his voluntary presence here before he left for Canada, and the government finding him here after his attempt to enter Canada, together satisfy the <u>mens rea</u> and <u>actus reus</u> elements of the crime of conviction. The district court's charge supported this theory of culpability, instructing the jury that "a person who is denied entry to a foreign country and is returned to the United States side of the port of entry did not leave the United States even if that person was physically on foreign territory before being brought back into the United States."  A-322.

In explaining why I cannot agree, I briefly consider the two elements of a § 1326 crime.  As to the <u>actus reus</u> element of being "found in" this country after deportation, our precedent instructs that the crime is not complete until the government becomes aware of defendant's illegal presence in this country.  <u>See</u> <u>United States v. Williams</u>, 733 F.3d 448, 453 (2d Cir. 2013).  Here, the government agrees that such awareness occurred only after Vasquez was returned in custody from Canada.    At that time, Vasquez's person was plainly within the geographical borders of the United States.  <u>See</u> 2 Leonard B. Sand <u>et al.</u>, <u>Modern Federal Jury Instructions: Criminal</u>, Instr. 33A-36 (2011) (hereafter <u>Sand</u>) ("To be found in the United States means to be located in the United States following

3

reentry.").  Nevertheless, a number of our sister circuits, in order to ensure against redundancy in the "enter," "attempt to enter," and "found in" prohibitions of § 1326, have held that, where a person unsuccessfully attempts to enter the country through a border point without deception, he cannot yet be "found in" the United States despite his physical presence within the country's borders because he is under official restraint.  See United States v. Angeles-Mascote, 206 F.3d 529, 531 (5th Cir. 2000) (holding that alien whose status as previously deported was discovered when he presented himself to immigration and customs authorities at airport was not "found in" United States); United States v. Canals-Jimenez, 943 F.2d 1284, 1287–88 (11th Cir. 1991) (same); see also United States v. Zavala-Mendez, 411 F.3d 1116, 1120 (9th Cir. 2005) (reaching same conclusion for alien approaching border station in motor vehicle).  If we were to agree—a question we need not here decide—that reasoning might itself support reversal of Vasquez's conviction for being "found in" the United States illegally, on the theory that his conduct admitted at best an attempted reentry.

The government, however, maintains that Vasquez was not here attempting to enter the United States from a foreign country because Canada had, in fact, denied him entry.  It argues that, despite his actual physical

4

departure from United States soil and brief physical presence in Canada, Vasquez should be treated as never having left the United States.

Insofar as this argument distinguishes physical from legal presence in a foreign country, suggesting that the latter is necessary to preclude a defendant who has departed the United States from being "found in" this country upon even involuntary return, I am not convinced. Vasquez may not have been legally present in Canada when he physically crossed into that country, but neither was he ever legally present in the United States before crossing into Canada. The government's real argument seems to be that where, as here, a defendant surreptitiously enters this country illegally, he somehow remains in this country—even if no longer here physically—until he enters another country lawfully, or at least until he does so free from official restraint. I disagree.

The official restraint doctrine places a limit on <u>our government</u> in proving a § 1326 crime.[1]   Thus, to prove unlawful entry or attempted entry, the government must establish that a deported alien came, or tried to come, "into the

---

[1] The official restraint doctrine has been held irrelevant to other criminal immigration laws. <u>See</u> <u>United States v. Munoz</u>, 412 F.3d 1043, 1049 (9th Cir. 2005) (holding that alien smuggled to United States "comes to" the United States under 8 U.S.C. § 1324(a)(2)(B) when he crosses the border regardless whether under official restraint).

5

United States from a foreign port or place while free from official restraint."

Sand at Instr. 33A-36.  See Correa v. Thornburgh, 901 F.2d 1166, 1172 (2d Cir.

1990) (holding that freedom from official restraint required to have entered

United States for purposes of § 1326).[2]  Insofar as the statute's "found in"

prohibition was included to cover defendants who surreptitiously entered the

United States, courts have required the government to prove "that the defendant

actually was in the United States free from official restraint."  Sand at Instr. 33A-

36, cmt. at 62 & n.6 (collecting cases).  I do not, however, think that the doctrine

places a limit on an alien's ability to depart this country, so that his presence in

the United States can fairly be said to continue uninterrupted at the same time

that his person is in another country, albeit under restraint by its officials.

Indeed, the conclusion borders on the metaphysical, raising concern about the

adequacy of the statute's notice about the criminal conduct proscribed.

This concern is only aggravated when one considers the crime's mens rea

element.  As already noted, the government does not dispute that § 1326 requires

proof of mens rea.  But as we consider precisely what intent is required to

---

[2] "Free from official restraint" has been defined to mean "free from observation
or surveillance by government officials for any period of time after one enters the
United States until the time one is apprehended or placed in custody."  Sand at
Instr. 33A-36.  See Correa v. Thornburgh, 901 F.2d at 1172.

6

support a "found in" conviction—a matter not previously addressed by this court—we confront the challenge of a silent statutory text. See United States v. Champegnie, 925 F.2d 54, 55 (2d Cir. 1991) (observing that § 1326 "contains no language requiring proof of a particular mental state"). The challenge is only enhanced by the fact that § 1326 does not codify a common law crime, where the law presumes a scienter requirement even where not expressly stated. See Morissette v. United States, 342 U.S. 246, 250–52 (1952); accord Liparota v. United States, 471 U.S. 419, 424–25 (1985). Nevertheless, in construing statutes, courts assume that Congress intends to legislate consistently with the Constitution. The Due Process Clause admits only a narrow category of strict liability crimes, generally limited to regulatory measures where penalties are relatively small. See Morissette v. United States, 342 U.S. at 258–60. Section 1326(b)(2), however, admits the possibility of a 20-year sentence. In such circumstances, we can properly presume that § 1326 requires at least some proof of mens rea to support conviction. See generally Conn. Bar Ass'n v. United States, 620 F.3d 81, 102 (2d Cir. 2010) (concluding that "absent clear indication in the language or legislative history of a contrary congressional purpose, mens rea is presumed to be an element of any federal crime").

Certainly, that is the conclusion this court has reached in considering the statute's "enter" and "attempt to enter" prohibitions. While we have declined to construe these prohibitions to require proof of a defendant's specific intent to disobey the law, see United States v. Newton, 677 F.2d 16, 17 (2d Cir. 1982); accord United States v. Rodriguez, 416 F.3d 123, 128 (2d Cir. 2005) (holding that conviction for attempted illegal reentry does not require proof that defendant knew he needed Attorney General's permission to enter United States); see also Sand at Instr. 33A-36, cmt. at 63–64 (observing that "every circuit to address the question has held that the government need not prove that the defendant knew it was illegal for him to enter the United States" to support § 1326 conviction), we have held that the government must prove general intent, as evidenced by "a voluntary act of reentry or attempted reentry by the defendant that is not expressly sanctioned by the Attorney General." United States v. Martus, 138 F.3d 95, 97 (2d Cir. 1998); accord United States v. Champegnie, 925 F.2d at 55 (holding intent to reenter United States sufficient mens rea for attempted reentry despite common law's history of requiring specific intent for attempt crimes); see Sand at Instr. 33A-36, cmt. at 63 (explaining why "section 1326 is better viewed as a

8

general intent crime requiring only that the defendant voluntarily enter the United States").

There is no reason to construe § 1326's "found in" prohibition not to require similar proof of <u>mens rea</u>. Even though being "found in" a place might be viewed as a "passive act" by the defendant, <u>see</u> <u>United States v. Salazar-Robles</u>, 207 F.3d 648, 650 (9th Cir. 2000), criminal culpability demands proof that the defendant was voluntarily in the United States either at the time he was found here or at some time after his last return to the United States before he was so found.

Voluntary presence at the time officials find a deported alien in this country does not require the government to prove how the defendant entered the United States. <u>See</u> <u>Sand</u> at Instr. 33A-36, cmt. at 62–63 & n.7 (citing cases). At the same time, courts have held that § 1326 does not require proof of voluntary presence at the precise moment a defendant is found in the United States. In <u>United States v. Salazar-Robles</u>, 207 F.3d 648, the illegal alien was in state prison when federal authorities discovered that he was in this country. The Ninth Circuit recognized that "[a]s Salazar-Robles did not voluntarily put himself in Folsom State Prison, he did not voluntarily commit the act" of being found in the

United States.  Id. at 650.  Nevertheless, that court upheld defendant's conviction, holding that the crime's mens rea element could be satisfied by proof that defendant was found in the United States (albeit in prison) as a result of his voluntary return to this country after deportation.  See id.

In this respect, being "found in" the United States may be considered a continuing offense that begins with the alien's voluntary return to this country after deportation and is completed when federal authorities discover his presence.  See United States v. Hernandez-Noriega, 544 F.3d 1141, 1143 (10th Cir. 2008) (holding that "'[a]lthough the act of returning to the United States must be voluntary, it is not relevant whether an alien's continued presence in the United States was voluntary at the moment of discovery'" (quoting United States v. Dixon, 327 F.3d 257, 259 (3d Cir. 2003))).  But I do not think the same continuing offense conclusion can apply where a defendant does not maintain a continuous physical presence in the United States between his voluntary return following deportation and authorities' discovery of his presence.  An intervening departure from the United States effectively breaks the continuum that allows the defendant's discovery in the country at one point to be attributed to his voluntary return at an earlier time, so as to satisfy both the actus reus and mens

10

rea elements of the "found in" crime. Thus, where a defendant is found in the United States only after an intervening physical departure, that discovery cannot be said to derive from the pre-departure return. Rather, to support a § 1326 "found in" conviction, the government must prove that the alien was voluntarily in the United States at some point between his most recent return to this country and his discovery by U.S. authorities.

That is not this case. There is no question that Canadian authorities returned Vasquez to this country in handcuffs, and that he remained so until he was surrendered to the U.S. authorities. Cf. United States v. Quintana-Torres, 235 F.3d 1197, 1200 (9th Cir. 2000) (observing that mens rea requirement for "found in" conviction would not be satisfied where defendant was "extradited [to United States] against his will"). United States v. Ambriz-Ambriz, 586 F.3d 719 (9th Cir. 2009), on which the government relies to argue that an alien denied entry into a foreign country never departs the United States, is distinguishable in that the alien there was allowed to return to the United States in his own car, whereupon he specifically—and falsely—identified himself to United States Customs officers as a United States citizen and produced a California driver's license. See id. at 720. Such conduct suggests that, having failed to achieve his

11

first objective, to enter Canada, Ambriz's intent was to gain entry to the United States.[3] Nothing in this case manifests that Vasquez had a similar intent to return to the United States after being denied entry into Canada. I recognize that the Ninth Circuit's decision in Ambriz-Ambriz does not depend on the circumstances I have highlighted. Nevertheless, these circumstances dissuade me from concluding, as the government urges, that, in the case of an alien who physically departs the United States but is denied entry to a foreign country, the mens rea element of § 1326 can be established based on the alien's voluntary entry into the United States prior to his physical departure.[4]

---

[3] Insofar as the mens rea requirement of voluntariness suggests the availability of a duress defense to a § 1326 charge, the burden would be on the defendant "to establish all elements of the defense, including the fact that the defendant surrendered to authorities at the first safe opportunity to do so." Sand at Instr. 33A-36, cmt. at 64. See United States v. Charleus, 871 F.2d 265, 270 (2d Cir. 1989). Cf. Dixon v. United States, 548 U.S. 1, 6–7 (2006) (stating that existence of duress normally does not negate defendant's criminal state of mind when applicable offense requires defendant to have acted knowingly or willfully).

[4] Indeed, neither Ambriz-Ambriz, nor the same court's decision in United States v. Gonzalez-Diaz, 630 F.3d 1239 (9th Cir. 2011), discusses the voluntariness requirement of a § 1326 "found in" violation. In concluding that an alien who physically departed the United States and was held in custody overnight in Canada "neither departed the United States nor entered Canada" but remained always "'in' the United States" through the time "he was 'found' by U.S. immigration authorities," Gonzales-Diaz recognized "two sound general propositions" that supported defendant's arguments to the contrary. Id. at 1242–

12

In Ambriz-Ambriz, the Ninth Circuit candidly acknowledged that its decision was animated by a concern that if the defendant in that case could not be prosecuted for being "found in" the United States on his return from Canada, he would escape prosecution altogether.

> Because Ambriz presumably did not have any intent to enter the United States, as he never legally left the country. . . , it is doubtful that Ambriz could be successfully prosecuted . . . for "entering" or "attempting to enter" the United States. Thus, if the court were to adopt Ambriz's argument that he cannot be prosecuted for being "found in" the United States, this could lead to the untenable result that the government could not prosecute Ambriz under any of the provisions of [§ 1326].

---

44. First, "an alien cannot be found <u>in</u> the United States if he has departed the United States before he is found. . . . [I]f an alien departs before his unlawful presence is discovered, the offense has not been committed." <u>Id.</u> at 1243 (emphasis in original). <u>Second</u>, "when an alien is entering the United States from a foreign country and is discovered at the border, he cannot be found <u>in</u> the United States until he is free from official restraint. . . . '[R]ather, the government must also establish that the alien entered the United States free from official restraint at the time officials discovered or apprehended him.'" <u>Id.</u> (quoting <u>United States v. Ruiz-Lopez</u>, 234 F.3d 445, 448 (9th Cir. 2000). Nevertheless, the court concluded that <u>Ambriz-Ambriz</u> "dictated" the conclusion that Gonzales-Diaz had neither departed the United States nor entered Canada "in the sense contemplated" by the authorities supporting the two cited propositions. <u>Id.</u> Because we are not bound by <u>Ambriz-Ambriz</u>, which is in any event distinguishable from this case for reasons discussed in the text of the opinion, I do not reach a similar conclusion here.

13

586 F.3d at 723 n.3. Insofar as this case also presents us with a defendant who avoids prosecution despite years of unlawful presence in the United States, I share the Ambriz-Ambriz panel's general concern. But at the same time the Ninth Circuit recognized the mens rea problem raised in prosecuting Ambriz for entering or attempting to enter the United States, it failed to acknowledge, I respectfully submit, the mens rea problem raised in prosecuting a defendant for being "found in" this country following his voluntary and actual physical departure from the United States and his involuntary return.

The government would have us solve this mens rea problem by adopting the legal fiction that a person who is no longer physically in this country, in fact, remains here so as to commit a continuing crime in violation of § 1326. I decline to do so. To be sure, in protecting its borders, a country may well make decisions about who has or has not lawfully entered its territory in ways that do not comport with actual physical presence. But such matters are best left to the legislature, particularly when they implicate criminal culpability, where a court's task is not to fill gaps in the law but to ensure its provision of adequate notice of the conduct proscribed. See generally Arriaga v. Mukasey, 521 F.3d 219, 224 (2d Cir. 2008) ("No one may be required at peril of life, liberty or property to

14

speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." (quoting <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453 (1939))).

In sum, while reversal is an unsatisfactory outcome in this case for a defendant who lived unlawfully in this country for approximately a decade, I join my colleagues in the majority in concluding that Vasquez's conviction for being "found in" the United States unlawfully cannot stand because

(1) the crime has an implicit <u>mens rea</u> element requiring proof of voluntary presence in the United States as well as an explicit <u>actus reus</u> element of being found in the United States;

(2) that requisite <u>mens rea</u> can be established either by proof of (a) lack of official restraint at the time defendant is found in the United States, or (b) evidence of defendant's voluntary presence in the country at or after his most recent return to the United States, and

(3) as a matter of law, the <u>mens rea</u> element was not proved in this case because

(a) Vasquez was under official restraint when he returned to the United States from Canada,

15

(b) no record evidence was adduced indicating that, upon being denied entry into Canada, Vasquez's intent was to return to the United States, and

(c) Vasquez's voluntary return to the United States after deportation almost a decade before he was found in this country could not supply the requisite <u>mens rea</u> because he had physically departed this country and was returned only in restraint.