Judge RAGGI concurs in a separate opinion.
WESLEY, Circuit Judge:
Walter Yovany Vasquez Macias (“Vasquez”) is a citizen of Honduras with a checkered immigration history in the United States. He was detained in California in 1990, left voluntarily, illegally reentered the country, and then sold drugs to at least two undercover officers in the late 1990s (leading to one criminal conviction and deportation in 2000). Vasquez again returned to the United States without authorization in approximately 2001;[1] he claims that he subsequently went straight and entered the antique business.
For reasons not known to us, Vasquez decided to abandon the antique market and leave the United States. With a *98 Mend, he traveled from Texas to Niagara Falls, where they walked across the Rainbow Bridge to Canada. Canada Border Services Agency (“CBSA”) officers first saw Vasquez on the Canadian side of the bridge as he walked in the car lanes towards Canada; they brought him to their facility for inspection. Vasquez lacked a passport or visa to enter Canada and his explanations about the reasons for his travel were not plausible. A CBSA agent testified that he “refuse[d] [Vasquez’s] entry” to Canada. The CBSA supplied Vasquez with an “Allowed to Leave” document, customarily created whenever someone from the United States attempts to enter Canada and is refused entry. Notwithstanding Canada’s “allowing” Vasquez’s departure, CBSA agents forcibly returned Vasquez to the United States in handcuffs.
CBSA agents handed Vasquez over to U.S. Customs and Border Protection (“CBP”) officials, who conducted an immigration investigation and records check. The CBP records check revealed that Vasquez was a Honduran citizen who had been asked to leave in 1990 and been deported in 2000 for his felony drug conviction. Vasquez was indicted for being “voluntarily present and found in the United States.”[2] Having been in the United States illegally for approximately ten years, he was convicted based on his failed attempt to begin anew in Canada. After trial, Vasquez renewed, albeit untimely, an earlier motion for a judgment of acquittal, arguing that he was not in the United States when he was found.
Discussion
The parties agree as to the facts of the case and as to most of the applicable law, but leave it to this Court to determine the meaning of “found in” and whether Vasquez was continuously “in the United States” within the meaning of 8 U.S.C. § 1326.[3] Because Vasquez was not in the United States when he was “found” and, when “found in” the United States, was here involuntarily, Vasquez’s conviction was plainly erroneous and it would constitute manifest injustice to allow it to stand.
I
The Government proposed that the term “found in[ ] the United States” is synonymous with “present in the United States.” We have previously rejected this interpretation. “The offense of being ‘found in’ the United States ... depends not only on the conduct of the alien but also on acts and knowledge of the federal authorities.” United States v. RiveraVentura, 72 F.3d 277, 281 (2d Cir.1995). “The commission of the offense is not complete ... ‘until the authorities both discover the illegal alien in the United States, and know, or with the exercise of diligence typical of law enforcement could have dis *99 covered, the illegality of his presence.’ ” United States v. Acevedo, 229 F.3d 350, 355 (2d Cir.2000) (alterations omitted) (quoting Rivera-Ventura, 72 F.3d at 282); see also United States v. Williams, 733 F.3d 448, 455 (2d Cir.2013).
II
The parties also disagree as to when Vasquez was “found in” the United States. The Government contends that, notwithstanding his physical presence north of the Canada / U.S. border, Vasquez never left the United States.[4] Vasquez argues that the first time that he was both “found” and “in[ ] the United States” was upon his forcible return to the custody of U.S. CBP agents. Because Vasquez was not in the United States while he was on Canadian soil seeking admission into Canada, he was not “found in” the United States until the CBSA brought him across the border in restraints and the U.S. CBP “discovered” him.
Prior to this “discovery,” Vasquez physically crossed the border from the United States into Canada; at that point, he had neither a legal nor a physical presence in the United States. If found at this point, Vasquez was not “in[ ] the United States” pursuant to the requirements of 8 U.S.C. § 1326. Nevertheless, under similar circumstances the Ninth Circuit has twice held that the aliens were “found in” the United States pursuant to a theory that employed a legal fiction of their continuous presence in the United States after having crossed into Canadian territory. See United States v. Gonzalez-Diaz, 630 F.3d 1239, 1243-44 (9th Cir.2011); United States v. Ambriz-Ambriz, 586 F.3d 719, 723-24 (9th Cir.2009).[5] The Ninth Circuit lays out two rationales for its view; neither is persuasive.
First, the Ninth Circuit noted that Am-briz “was never legally in Canada, and thus, ... was not entering the United States from a foreign country.” 586 F.3d at 723; see also Gonzalez-Diaz, 630 F.3d at 1244. Two assumptions underlie this analysis: first, for purposes of the statute, physical presence is not synonymous with legal presence; second, Ambriz and Gonzalez-Diaz must have been legally either in Canada or in the United States. We disagree with the second proposition and therefore do not reach the first.
Aliens attempting to enter the United States, stopped in analogous circumstances, are not legally in the United States. See, e.g., United States v. Angeles-Mascote, 206 F.3d 529, 531 (5th Cir. 2000); United States v. Canals-Jimenez, 943 F.2d 1284, 1287-88 (11th Cir.1991). However, nothing cited in these cases, Ambriz-Ambriz, Gonzalez-Diaz, or the parties’ briefs suggests that these aliens, turned away at a United States port of entry, were considered to be present in *100 their countries of origin (while physically in a U.S. airport, border crossing, or port).
Indeed, the Supreme Court has recognized that a person, denied entry into the United States, might also not be present in any other country. See, e.g., Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 209, 216, 73 S.Ct. 625, 97 L.Ed. 956 (1953). In Mezei, the Government detained and refused entry, for security reasons, to a once-resident alien returning from a trip to Hungary. Id. at 207-08, 73 5.Ct. 625. Every country consulted (France, through which he traveled en route to the United States; the United Kingdom; Hungary; and “about a dozen Latin American countries”) refused to take him. Id. at 209, 73 S.Ct. 625. “His presence on Ellis Island did not count as entry into the United States,” Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); however, neither was he in France, Hungary, or elsewhere.[6]
The possibility that Vasquez was outside the United States once he exited our borders finds mixed support in his treatment by customs officials at the border. A U.S. CBP official testified that Vasquez was treated, at least in some respects, as though he had never left the United States, but a CBSA agent testified that Vasquez made it far enough that he could not have turned around and returned to the U.S. side of the Rainbow Bridge. Vasquez was transported, in custody, under a status known as “immigration examination.” On his return, United States officials did not permit Vasquez to leave; they took his fingerprints and ran them through national databases, questioned him in secondary inspection, forced him to fill out customs paperwork, and ultimately arrested him.
Insofar as Vasquez’s treatment mirrored U.S. CBP’s customary treatment of immigrants seeking to enter through ports of entry, this would be insufficient to support Vasquez’s conviction for entering the United States, based on the doctrine of “official restraint.” See, e.g., United States v. Zavala-Mendez, 411 F.3d 1116, 1119-20 (9th Cir.2005); Angeles-Mascote, 206 F.3d at 531. The official restraint doctrine requires “both physical presence in the country as well as freedom from official restraint” before an “attempted entry” becomes an “actual entry.” Angeles-Mascote, 206 F.3d at 531 (internal quotation marks omitted). The same principles apply to being “found in” the United States; if an alien’s presence here (after she has left the country) is so attenuated that she has not yet “entered,” then it is insufficient to support “found in” liability.[7]
The criminal liability of previously-deported, undocumented aliens who are denied admission into Canada is a new ques *101 tion for this Court, but we have examined the treatment of goods that were taken into Canada and did not clear customs. See United States v. 1903 Obscene Magazines, 907 F.2d 1338, 1340 (2d Cir.1990). In Obscene Magazines, we held that “goods rejected by the Customs officials of a foreign country to which export is attempted are imported from that foreign country....” Id. at 1343 (internal quotation marks and alteration omitted). “Whether the magazines were accepted into Canada or denied entry and held by Canadian Customs is irrelevant. Regardless of their fate in Canada the objectionable publications were presented at the United States border for entry into the United States from without when they were seized.” Id. at 1342. The obscene magazines were entering the United States, regardless of whether or not they were in Canada.[8] We see no reason not to extend this reasoning to aliens’ reentry into the United States.
Ill
The Ninth Circuit also justified its Am-briz-Ambriz decision because it believed that the “found in” prong was the only way that Ambriz could be prosecuted. 586 F.3d at 723 & n. 3. This assumes both that Ambriz (or Vasquez) could not be prosecuted for attempting to enter the United States and that the conclusion that no statute prohibits their conduct is an “untenable result.” Id. at 723 n. 3. We do not share our sister circuit’s concern. While we recognize that criminal behavior should be punished, we are also mindful of the “cautionary example,” State v. Eaton, 168 Wash.2d 476, 483 n. 4, 229 P.3d 704 (2010), of the infamous case of Rex v. Larsonneur, 24 Cr.App. R. 74, [1933] 24 A.C. 74 (Eng.).[9] Moreover, Congress has not outlawed all travel between sovereign nations, and not every unlawful stay in the United States— even by a previously-deported alien — can or should result in a criminal conviction. Cf. United States v. Thomas, 492 F.Supp.2d 405, 412 (S.D.N.Y.2007).
The law does not bend to meet the facts of each case. Although Vasquez undeniably broke the laws of the United States at some point after his 2000 deportation, he is not guilty of the crime of which he was convicted. We are not too troubled by this seeming oddity. Even though we reverse his criminal conviction, Vasquez will (again) be subject to deportation.[10] Moreover, it seems equally anomalous to punish Vasquez for being “found in” the United States when he was only “found” based on his attempt to stop living in the United States unlawfully. This would create a disincentive for undocumented, previously-deported aliens to do the one thing that Congress would most like them to do— leave. Cf. Thomas, 492 F.Supp.2d at 409.
*102 As referenced above, upon returning to the United States, Vasquez was more analogous to previously-deported aliens who seek to enter the United States at a port of entry. Like them, Vasquez was processed by U.S. CBP agents. And like the agents in Angeles-Mascóte, the U.S. CBP agents here ran Vasquez’s information through immigration databases and examined his prior immigration history. 206 F.8d at 530. Vasquez’s indictment charged him only with being “found in” the United States, rather than also including the attempted entry prong of 8 U.S.C. § 1326.[11]
Two primary but immaterial differences separate Vasquez from cases like Angeles-Mascóte. First, unlike Angeles-Mascóte, Vasquez was entering the United States after having been denied entry into another country, rather than after having been legally present in another country. Because nothing in 8 U.S.C. § 1326 requires entry into the United States following legal presence in another country, this distinction should not matter. Cf. Obscene Magazines, 907 F.2d at 1343. Second, unlike Angeles-Mascóte, Vasquez did not wish to be inside the United States. Indeed, despite the indictment’s (unnecessary) charge that Vasquez “was voluntarily present” in the United States, the only expression of Vasquez’s will was his strong desire to get out of the country.[12] This does not make Vasquez more susceptible to prosecution under 8 U.S.C. § 1326 than if he intended to enter the United States.
Vasquez and Angeles-Mascóte were both not “in the United States” when they were found; like Angeles-Mascóte, Vasquez is therefore entitled to judgment as a matter of law. It was plain error for Vasquez to be convicted of being “found in” the United States, and allowing his conviction to stand would constitute manifest injustice.
Conclusion
Although he had indisputably been present in the United States illegally for nearly a decade, Vasquez was not “found” while he was in this country. When he was found — admittedly not long after his departure from the United States — Vasquez had neither a physical nor a legal presence in this country. When he had been “found” and was “in[ ] the United States,” Vasquez had been returned involuntarily with neither a desire to enter, nor a will to be present in, the United States. As a result, Vasquez was not “found in[] the United States” within the meaning of 8 U.S.C. § 1326.
For the foregoing reasons, the judgment of conviction entered in the district court is REVERSED and the case is REMANDED with instructions to enter a judgment of acquittal.

. Although his 2001 unlawful reentry may have constituted a separate violation of 8 U.S.C. § 1326, it is not at issue in this case (and the statute of limitations on such a violation would already have expired).

. This language from his indictment does not precisely mirror the statutory requirements of 8 U.S.C. § 1326; however, we presume that he was convicted of the crime alleged in the indictment, and the Government does not allege otherwise. If it did, then we would be forced to determine whether his conviction constituted a prejudicial variance from the terms of his indictment.

. This section indicates, in relevant part, that: [A]ny alien who ... has been ... deported, or removed ... and thereafter ... enters, attempts to enter, or is at any time found in, the United States, unless ... the Attorney General has expressly consented to such alien’s reapplying for admission; or ... such alien ... establishes] that he was not required to obtain such advance consent ... shall be fined under Title 18, or imprisoned not more than 2 years, or both.
8 U.S.C. § 1326(a). Vasquez does not contend that he had the authority to enter or that his reentry did not require advance authorization.

. Of course, this would mean that Vasquez was "found” by Canadian border officials in the United States. That seems a bit curious, but neither party has advanced the argument that being "found” by agents of a foreign government is not sufficient to trigger liability under the statute, and we therefore assume for the purposes of this case that the CBSA agents were capable of “finding” Vasquez.

. Ambriz and Gonzalez-Diaz, • appellants in the Ninth Circuit cases, also returned to the United States after seeking admission to Canada. By seeking refugee status, Gonzalez-Diaz actually secured an overnight stay 55 miles into Canada before being returned to the United States in custody. Gonzalez-Diaz, 630 F.3d at 1241. As in this case, in Gonzalez-Diaz “the indictment charged Gonzalez-Diaz only ... with being found in the United States.” Id. at 1242 (emphasis retained). Nevertheless, the Ninth Circuit held that he had not left the United States for the purposes of 8 U.S.C. § 1326. Id. at 1244.

. Two recent examples of a similar phenomenon include suspected traitor Edward Snow-den, who had his passport rescinded as he fled the United States for Russia and was stranded in the "transit zone" of Sheremetye-vo International Airport, "which is technically considered outside Russian territory," Lukas I. Alpert, Four Days In, Fugitive’s Airport Stay Falls Short of Many Terminal Cases, Wall. St. L, June 27, 2013, at A6; and Mehran Karimi Nasseri, who inspired the Steven Spielberg movie The Terminal. See Ethan Gilsdorf, Behind ‘The Terminal,’ A True Story, Christian Sci. Monitor, June 21, 2004, at 11.

. The Ninth Circuit has held that "the official restraint doctrine 'pertains to an individual entering the United States from a foreign country, and thus is inapplicable’ ” in cases like this one. Gonzalez-Diaz, 630 F.3d at 1243 (emphasis added) (quoting Ambriz-Ambriz, 586 F.3d at 723). Neither Gonzalez-Diaz nor Ambriz-Ambriz explains why the logic of the official restraint doctrine, which distinguishes between physical and legal presence, should not apply unless an alien is entering from another country. Id.; Ambriz-Ambriz, 586 F.3d at 723-24.

. At least one other circuit has held (albeit in an unpublished opinion) that U.S. citizens’ reentry into the United States after a failed attempt to take an excursion into Canada constituted a separate entry into the United States. United States v. Snyder, No. 01-2382, 2002 WL 417278, at *1 (8th Cir.2002).

. Criminal law scholars remember that in Larsonneur, a French woman lawfully in the United Kingdom was instructed to leave the country by March 22, 1933; she dutifully traveled to the Irish Free State (then a distinct entity). 24 Cr.App. R. at 76. Not only did the Irish Free State deny her admission, but "the defendant was forcibly brought back to the United Kingdom by police and then convicted of being in the U.K. illegally.” Ian P. Farrell and Justin F. Marceu, Taking Vol-untariness Seriously, 54 B.C. L. Rev. 1545, 1589 (2013).

.While a skeptical observer might ask what good deporting Vasquez will do, as he has returned without authorization at least once already, we note that in this case Vasquez's genuine attempt to leave might hint at his disinclination to return.

. In Angeles-Mascóte, the indictment charged that Angeles-Mascóte "knowingly[] and unlawfully entered and was found in the United States.” 206 F.3d at 530-31. Had the Government also indicted Vasquez for entering or attempting to enter the United States, we may have been faced with determining which prong of 8 U.S.C. § 1326, if any, applied to Vasquez's conduct.

. We note that Vasquez physically left the United States and was returned in handcuffs without manifesting a desire to stay — yet the Government charged him for his "voluntary” presence. If we felt it necessary to reach the specific mens rea requirement of 8 U.S.C. § 1326(a), we would likely agree with Judge Raggi's well-reasoned concurrence.